| | |
|---|---|
| ESTATE OF CHRISTOPHER J. DAVIS and DORETHA LOCK, | |
| Plaintiffs, | Case No. 18-CV-1846-JPS |
| v. | |
| JUAN ORTIZ, WALWORTH COUNTY, KURT PICKNELL, TOWN OF EAST TROY, VILLAGE OF EAST TROY, JAMES SURGES, ALAN BOYES, JEREMY SWENDROWSKI, PAUL SCHMIDT, CRAIG KNOX, JEFF PRICE, AARON HACKETT, JOSE G. LARA, ROBERTO JUAREZ-NIEVES, JR., WISCONSIN MUNICIPAL MUTUAL INSURANCE COMPANY, EMPLOYERS MUTUAL CASUALTY COMPANY, and AMERICAN ALTERNATIVE INSURANCE CORPORATION, | **ORDER** |
| Defendants. | |

## 1.     INTRODUCTION

On February 24, 2016, Christopher Davis ("Davis") was shot and killed by Walworth County (the "County") sheriff's deputy Juan Ortiz ("Ortiz") in the course of a police sting operation which aimed to arrest drug dealers. Davis' estate and his mother have sued Ortiz, the County, the County Sheriff Kurt Picknell ("Picknell"), and a host of other defendants for violating Davis' constitutional rights. The other defendants are the Town of East Troy (the "Town"), as well as its police officers Craig Knox ("Knox"), Paul Schmidt ("Schmidt"), and James Surges ("Surges"), and the Village of

East Troy (the "Village"), and its officers Alan Boyes ("Boyes"), Aaron Hackett ("Hackett"), Jeff Price ("Price"), and Jeremy Swendrowski ("Swendrowski"). All Defendants have filed motions for summary judgment. (Docket #91, #97, and #103).[1] For the reasons explained below, the motions must be granted in large part. Only Plaintiffs' claim of excessive force alleged against Ortiz will remain for trial.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "'create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.'" *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens*

---

[1]Plaintiffs also sued Jose G. Lara ("Lara") and Roberto Juarez-Nieves ("Nieves") who were also targets of the sting operation that day. Both are in prison and are in default in this matter. They have, of course, not filed their own motions for summary judgment.

*v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3.    RELEVANT FACTS

Preliminarily, the Court notes that many of Plaintiffs' putative factual disputes must be set aside. In many instances, Plaintiffs' response to a particular statement of fact is comprised of the words "dispute" or "deny," unaccompanied by any further explanation of the basis of the disagreement or, more importantly, any citation to evidence. *See, e.g.*, (Docket #112 ¶ 8; Docket #113 ¶ 6; Docket #114 ¶ 20). This approach to factual briefing is not permitted by the Federal or Local Rules of Civil Procedure. Fed. R. Civ. P. 56(c); Civ. L. R. 56(b)(2)(B).

With that caveat in mind, the following are the facts material to the Court's decision when viewed in Plaintiffs' favor. On February 24, 2016, Price was dispatched to assist in a domestic disturbance call. One of the suspects was found with marijuana, sandwich bags, and a scale, and upon questioning admitted to being a drug dealer. Price proposed that the suspect work as a confidential informant for the police in exchange for consideration on his drug charges. The suspect, hereinafter the "CI," agreed, and Swendrowski, the Village's deputy chief of police, also approved of the plan.

Before finalizing any deal, however, Price had to determine whether the CI had useful information to provide. The CI told Price about the types of drugs he could obtain and the people who supplied them. Price examined the CI's phone to verify his claims. Price was now in a position

to offer the CI some consideration for his help, including dismissal of the charges and release of his vehicle, which was set to be impounded. In exchange, the CI had to get some drug dealers to come to the Village with their product so they could be arrested.

The CI's first contact was with Nieves, from whom the CI had previously purchased cocaine. The CI texted Nieves, asking to buy more cocaine, and Nieves responded that he needed time to see what he could come up with. Because of this uncertainty, Price had the CI call another dealer, Marcus Ruhrer ("Ruhrer"). The CI had bought marijuana from Ruhrer hundreds of times. The CI made arrangements for Ruhrer to bring marijuana to a local gas station.

Price called for assistance from the Walworth Country Drug Unit, but no one from the unit was available, so Ortiz, a regular deputy, was sent to help. Price met with Ortiz, Swendrowski, and Hackett at the Village police station to formulate a plan for the Ruhrer sting. They determined that they would set up at a local gas station, where they would perform a traffic stop on Ruhrer when he arrived. Hackett would be at the gas station in plain clothes, pretending to pump gas, while Price would remain in his vehicle with the CI in tow.

Price stopped Ruhrer as per the plan, and Ruhrer was taken away for processing by other officers.[2] Meanwhile, the CI remained in contact with Nieves. Nieves had contacted Lara, who found a source for the drugs, and Davis agreed to be the driver. The group took Davis' car to pick up the drugs and then proceeded to East Troy. Davis knew the plan was to sell the

---

[2]Price and the others initially stopped someone else who they thought was Ruhrer—the odor of marijuana emanated from the stopped car—but soon realized that it was not him. Ortiz and Swendrowski stayed to finish that traffic stop, while Price left to re-set the trap for Ruhrer.

drugs to the CI, and he was to receive $150 for his assistance. As they entered the town, Lara was driving, Davis was in the front passenger seat, and Nieves was in the back.

The sale was originally set to occur in the area near the Ruhrer arrest, but with police still at that scene, the CI changed the location to Roma's, a nearby restaurant. Davis and the others arrived first and contacted the CI. Nieves relayed that the group were in a Pontiac Bonneville parked next to a dark-colored Mercury Grand Marquis. The CI responded that he was on his way, but Nieves said they would only wait for him for a few minutes.

The CI was actively relaying this information to Price. At this point, Price met with Ortiz, Hackett, Knox, Schmidt to discuss their approach to the putative sting. Price informed the others that they were looking to arrest suspected drug dealers carrying cocaine for sale. He further explained that the plan would essentially be the same as the Ruhrer sting: find a traffic violation and arrest the occupants of the car. As Ortiz understood it, they were to do a "take down," contacting the occupants of the Davis vehicle, surrounding them, and making arrests.

Though the officers hoped to find such a traffic violation, they felt they had probable cause to stop the car and make arrests based on the information provided by the CI.[3] The reliability of the CI's information was reinforced by the fact that the CI had just helped secure Ruhrer's arrest. The officers agreed to position themselves around Roma's but did not discuss specific locations.

Knox led the way into the Roma's parking lot, with Schmidt as his passenger. They found the Grand Marquis and parked behind it. They did not see anyone in that vehicle, but noticed Davis and the others in the

_____

[3]The registration on Davis' vehicle was also expired as of February 24, 2016.

Bonneville beside it. Prior to Knox's arrival, Davis and his cohorts discussed their belief that something was wrong. They concluded that the CI's deal was a setup and decided to leave. This was at precisely the same time that Knox exited his vehicle and moved toward the Bonneville. Lara had seen Knox pull into the parking lot before he started to back out of his parking spot, but he thought it was just a coincidence that the police were there. Lara backed out of the parking spot slowly and came to a stop.

Knox drew his gun and yelled for the occupants to show their hands. After about a five-second delay, Lara accelerated forward to escape the parking lot. Indeed, Lara and Nieves claim that they never saw Knox or heard him shout. Seeing that Lara would not comply with his command, Knox quickly returned to his vehicle to record the license plate number.

By this time, Ortiz had positioned himself near one the entrances to the parking lot. Price had also entered the lot and stopped near Ortiz.[4] Seeing Knox with his weapon drawn, both Ortiz and Price got out of their cars and did likewise. Ortiz realized that he was in an area that might receive cross-fire from Knox if shots were fired. Thus, Ortiz moved a few paces to his left, placing himself generally between the Davis vehicle and the nearest parking lot entrance. Lara testified that Ortiz was not directly in the path of the entrance, but rather off to one side of it.

Returning to when Lara accelerated, he took the car towards the nearest parking lot entrance. Defendants state that Lara aimed the car towards Ortiz, who believed he would be struck, and thus decided to shoot at the Davis vehicle. Ortiz emphasizes that he felt he would have been hit

---

[4]Price and Knox differ on where Price parked, whether by Ortiz or by Knox, but for purposes of this Order, the Court must assume he was near Ortiz, as Plaintiff advocates.

even if he had attempted to dodge the oncoming car. Plaintiff maintains that, based on Lara, Nieves, and Knox's deposition testimony, the car was not aiming towards Ortiz.[5] Plaintiff also believes that the car did not actually accelerate towards Ortiz until *after* Ortiz began firing. The basis for this belief is two-fold: Hackett's testimony that, although he could not see what was happening, he did not hear squealing tires until after shots had been fired, and Lara's testimony that he did not rapidly accelerate until he heard shots.[6]

Ortiz fired his weapon as soon as he drew it, and fired four shots within the span of one second, giving the other officers no time to counsel against that action. Ortiz, for his part, insists that he felt he had to shoot to stop the vehicle coming at him. Plaintiffs counter that Ortiz was in fact moving out of the way of the vehicle *while* he was shooting, and could have moved either left or right to get out of the way. One of the shots struck Davis in the head, though Ortiz never specifically aimed at Davis. Rather, Ortiz says he was focused on the driver. Despite the shots, the Davis vehicle nonetheless made its way out of the parking lot in about three seconds. Defendants insist that Ortiz had perhaps less than one second to react to the threat posed by the Davis vehicle. Plaintiff counters that, again, all of the

---

[5]Knox testified that he did not know where the vehicle was aimed for the first two shots, but that it did not appear to be directed at Ortiz for the second two shots. (Docket #101-3 at 124:16–126:2).

[6]Hackett's testimony is not the picture of clarity. At first, he said he did not remember which occurred first, the shots or the squealing tires. (Docket #101-2 at 55:11–17). Later, Hackett followed counsel's leading question that he did not hear squealing tires prior to shots being fired. *Id.* at 75:10–14. At this stage of proceedings, the Court must construe the inconsistency in Plaintiffs' favor. The jury will not be so constrained.

shots occurred before the vehicle began moving towards Ortiz, and that the Davis vehicle was not aimed at him.

The officers engaged in a high-speed pursuit of the vehicle. The Davis vehicle eventually crashed, and Lara and Nieves fled on foot. They were soon captured. Law enforcement and emergency medical personnel attempted to treat Davis, who had been left in the car, but he died of his wounds. Lara and Nieves pleaded guilty to charges related to their involvement in the sting.

Hours after the incident, Schmidt was interviewed by investigators of the Wisconsin Division of Criminal Investigation. He was critical of the way the day's events played out, including the lack of manpower and adequate information to accomplish the group's goal. Along with his summary judgment briefing, Schmidt submitted an affidavit which suggests that his criticisms were motivated by the emotion of the day, and were not his true beliefs about the operation. Plaintiff claims that the affidavit must be excluded as a sham, *Bank of Ill.*, 75 F.3d at 1170, but the testimony is not a complete contradiction. Rather, it offers some explanation of the depth of Schmidt's feelings. The affidavit is, therefore, not excludable as a matter of law.

At the time of the incident, Ortiz had been a sheriff's deputy for almost four years. As part of that role, he was trained on use of deadly force, high-risk vehicle encounters, and judgment and decision making. Use-of-force instruction is also an important part of that training. Plaintiff presents the expert testimony of Brian Landers ("Landers"), a former police officer and a current professor of criminal justice at Madison College, who opines that Ortiz's training was inadequate to prepare him for the circumstances of February 24, or at least that this training was not well-documented. *See*

(Docket #116-1 at 34). According to the County's witness on training protocols, its firearm training consisted only of range shooting.

4.    **ANALYSIS**

Plaintiffs present a litany of claims against Defendants in the following enumerated counts:

a)  Count One – Excessive force against Ortiz;

b)  Count Two – Unreasonable seizure and use of deadly force against all Defendants save Lara and Nieves;[7]

c)  Count Three – Failure-to-intervene against Knox, Price, Schmidt, Swendrowski, Hackett, and Ortiz;

d)  Count Four – *Monell* liability against the County;

e)  Count Five – *Monell* liability against the Town;

f)  Count Six – *Monell* liability against the Village;

g)  Count Seven – Indemnification against the County, Town, and Village;

h)  Count Eight – Wrongful death against all Defendants save Lara and Nieves; and

i)  Count Nine – Wrongful death against Lara and Nieves.

The Court will address each claim below, grouping them where appropriate.

**4.1    Excessive Force – Ortiz**

Ortiz makes three arguments in favor of dismissal of the excessive force claim. His first is that the Fourth Amendment is entirely inapplicable to his conduct. A seizure, as required to implicate Fourth Amendment liability, does not occur anytime that police terminate a person's freedom

_____

[7]Plaintiffs' complaint also states that Count Two incorporates a claim of unreasonable search, but no search of Davis, unlawful or not, is alleged anywhere in this case.

of movement. *Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003). To constitute a seizure, the officer must actually intend to stop the person who is being stopped. *Id.* Thus, when police use force, there is a distinction between accidental or even negligent harm caused to an innocent passersby and the intentional detention of a criminal suspect. *Id.* Ortiz likens Davis to a passerby. It is undisputed that Ortiz did not intentionally target Davis. Rather, Ortiz testified that his goal was to stop the threat posed by the Davis vehicle coming at him, and that he was focused on Lara as the driver.

Ortiz's argument stretches both the facts and the law beyond their limit. As to the facts, Ortiz tries to claim that he was aiming at Lara to the exclusion of anyone else. But that is not his testimony. In truth, Ortiz said that his "intent was to stop the threat that was coming at [him],"and he agreed that "firing into the vehicle was the way to stop that threat[.]" (Docket #102-1 at 109:21–25). Ortiz also described what he saw at the time and where he was focused, namely the driver, the driver's hands, and the steering wheel. *Id.* at 50:11–52:25, 105:10–21. At no time did Ortiz state that he was aiming his weapon solely at Lara in such a manner as to eliminate all potential inferences otherwise.

Additionally, Ortiz's own case citations undermine his position. The *Bublitz* plaintiffs were a family of innocent motorists struck by a suspect's vehicle as the suspect attempted to flee the police in a high-speed chase. *Bublitz*, 327 F.3d at 487. The court concluded that the Bublitzes could not invoke the Fourth Amendment to sue the officers involved because they "did not intentionally apply any means in an attempt to terminate the freedom of movement of the Bublitz family—the unfortunate collision between James [the suspect] and the Bublitzes was not a means intended by police to stop the family, but rather an unintended consequence of an

attempt to seize James." *Id.* at 489. The Bublitzes nevertheless argued that the police did take intentional action, namely trying to stop James, and must have therefore intended the further consequences of that action, even if those consequences were not entirely foreseen. *Id.* The court disagreed: "[I]t does not follow that because [the officers] intended to stop James's car, [they] therefore intended to stop any other car that could potentially become involved in a subsequent collision. The subsequent collision was instead the accidental and wholly unintended consequence of an act that happened to be committed by a government official." *Id.*

Compare the Bublitzes to the *Duran* plaintiffs, who were a large group having a party in a family home. *Duran v. Sirgedas*, 240 F. App'x 104, 106–07 (7th Cir. 2007). They clashed with police over noise complaints. *Id.* Officers eventually surrounded the house and arrested some of the guests. *Id.* They also sprayed pepper spray *into* the house. *Id.* The thirty-four pepper spray victims sued the officers alleging excessive force in effectuating a seizure. *Id.* at 108. The officers claimed that they did not seize any of the victims because none of the members of the large group was a direct target of the pepper spray. *Id.* The court rejected this position, distinguishing the victims from the Bublitzes, who were "innocent bystander[s] . . . unintentionally injured as a result of an officer's alleged excessive force." *Id.* at 112 n.5. By contrast, the victims specifically claimed to be a target of police action. *Id.* at 112. Further, the court observed that "if a police officer intends to inflict injury, without justification, the fact that the officer intentionally targets a large group of individuals, as opposed to a specific individual," does not absolve the officer of constitutional liability. *Id.*

Davis is more akin to the pepper spray victims than the Bublitzes. Viewing the evidence in a light most favorable to Plaintiffs, and taking inferences in their favor, a jury could conclude that Ortiz was shooting at the car *generally* to make it stop, rather than at the driver or any other particular area of the vehicle. Davis, as an occupant of the car, was not an innocent bystander whom Ortiz could not foresee harming with his decision to fire. In other words, Ortiz is not saved from Fourth Amendment liability simply because he directed his force towards a group of people (and the large object they were in at the time), rather than a person standing alone.

Ortiz next contends that even if the Fourth Amendment applies to his conduct, his use of force was not excessive. When police officers use force against citizens in carrying out their duties, the Fourth Amendment requires that the force used be reasonable. *Weinmann v. McClone*, 787 F.3d 444, 448–49 (7th Cir. 2015). Reasonableness is a fact-intensive inquiry in light of the totality of the circumstances, including "the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015). The standard also accounts for the fluidity and rapidity of use-of-force situations, and does not permit evaluation of the force used based on hindsight. *Id.* at 473. The Seventh Circuit instructs that "[a]n officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure." *Id.* With respect to deadly force in particular, "[t]he Supreme Court further has counseled that it is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer

in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009).

Ortiz claims that no reasonable jury could conclude that shooting at the car was excessive in light of the danger he faced. Cars can certainly be used as deadly weapons, *Tolliver v. City of Chi.*, 820 F.3d 237, 245 (7th Cir. 2016), and Ortiz was certain that the Davis vehicle was coming at him at a high rate of speed. Price and Schmidt corroborate Ortiz's view. Ortiz also claims that he had no choice but to shoot to stop the car.

Ortiz's position fails to account for Plaintiffs' evidence and the standard of review applicable at the summary judgment stage. Lara and Nieves are adamant that the car was not aimed at Ortiz. Further, they assert that Ortiz began shooting before they accelerated in his direction. Plaintiffs say that this is buttressed by Hackett's testimony that he heard squealing tires before he heard gunshots. Along with other inconsistencies in the officers' recollection of events, Plaintiffs suggest that testimony of Lara, Nieves, and Hackett supplies ample grounds for a jury to disbelieve the officers' version of the incident. Finally, Plaintiffs maintain that Ortiz helped create the life-threatening danger he claims to have faced, as he got out of his car, put himself in the most likely path of escape for the Davis vehicle, and did not move out of the way as the vehicle approached.

The Court cannot weigh the evidence—Ortiz questions how Hackett's auditory perception could overcome the other officers' direct view of events—or judge credibility—Lara and Nieves are known drug dealers and now imprisoned felons—regardless of how weak Plaintiffs' case might seem. The Court also is not able to definitively decide whether Plaintiffs' theory about Ortiz creating danger holds any water. *See Estate of*

*Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (whether deadly force was justified depends on whether the officers placed themselves in the vehicle's path or whether it was aimed at them from the start).

Ortiz ignores these restrictions, inviting the Court to dissect the minutiae of all of the witnesses' testimony to find that his recollection is somehow technically undisputed. The Court declines the invitation. Ortiz's arguments must be presented to the jury. Only they can determine what actually happened on February 24, 2016.

Ortiz's final bid to avoid liability is an assertion of qualified immunity. Qualified immunity protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Plaintiffs bear the burden to defeat the defense once raised, and must prove two elements to do so. *Weinmann*, 787 F.3d at 450. First, Plaintiffs must proffer facts which, if believed, amount to a violation of constitutional rights. *Id*. Second, they need to show that the right in question was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 F. App'x 623, 656 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Earlier this year, the Supreme Court offered this concise statement of the rule:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, . . . which means it is dictated by

controlling authority or a robust consensus of cases of persuasive authority[.] It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.

. . .

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (citations and quotations omitted).

In his opening brief, Ortiz argues that he is entitled to qualified immunity on the ground that it was not clearly established that Davis possessed any Fourth Amendment rights as a passenger of the vehicle Ortiz fired at. Plaintiffs overlook Ortiz's argument, and instead attempt to demonstrate that Ortiz should not be afforded qualified immunity on the issue of whether his use of deadly force was justified under the circumstances. In particular, Plaintiffs contend that when viewing the evidence in his favor, Ortiz began shooting at the Davis vehicle before it sped out of the parking lot, and when it was not aimed at him. Plaintiffs' maintain that the basic prohibition on using deadly force against suspects who pose no grave threat is sufficient to "clearly establish" the impropriety of Ortiz's conduct. *Tennessee v. Garner*, 471 U.S. 1, 10–11 (1985) ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."). In reply, Ortiz notes

Plaintiffs' failure to respond to his initial position, and further contends that careful consideration of the evidence yields a set of undisputed facts wherein it was reasonable for Ortiz to shoot.

Disputes of fact on each material issue preclude a finding of qualified immunity at this juncture. As to whether Davis' Fourth Amendment rights were implicated at all, the Court's analysis above shows that it is unclear what Ortiz was actually shooting at when he fired towards the Davis vehicle. And as to the reasonableness of deadly force, the Court has similarly concluded that there are triable issues of material fact as to the circumstances immediately preceding the shooting.

When the facts are in dispute, a court's qualified immunity inquiry is extremely limited. It can only consider whether a constitutional violation occurred "accepting the facts and inferences in the light most favorable to the plaintiff[s]." *Estate of Williams by Rose v. Cline*, 902 F.3d 643, 648–49 (7th Cir. 2018). Again, the Court declines Ortiz's invitation to traverse a narrow path through the evidence to find an undisputed basis for his use of deadly force. Viewing the evidence in Plaintiffs' favor, Ortiz was not justified in shooting at the moment he did so. At trial, the jury will be called upon to resolve the factual disputes noted above. Once the jury has made findings as to the pertinent facts, Ortiz may re-apply for qualified immunity, if appropriate. *Fox v. Hayes*, 600 F.3d 819, 823–33 (7th Cir. 2010).

### 4.2 Unreasonable Seizure and Excessive Force – All Law Enforcement Defendants

Plaintiffs have failed to address this claim in their response brief, despite Defendants' arguments for dismissal of the claim. Instead, as discussed below, Plaintiffs appear to have focused their efforts on the next claim, for failure-to-intervene against certain of the officers, as it is

intimately related to this claim. Plaintiffs have either intentionally abandoned this claim or have simply forgotten about it. Either way, the failure to oppose Defendants' arguments operates as a waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). This claim will be dismissed.

### 4.3 Failure to Intervene to Prevent the Unreasonable Seizure and Excessive Force – Knox, Price, Schmidt, Swendrowski, Hackett, and Ortiz

Generally, the Constitution only requires government actors to refrain from certain conduct. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). At times, however, an officer's omission or failure to act can violate a person's civil rights. *Id.* This theory of liability, known as a failure-to-intervene claim, is described in *Yang* as follows:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Id.*

The most common instance where a failure-to-intervene theory is applied is cases of excessive force, as in *Yang*. Plaintiffs do not, however, contend that anyone should have stopped Ortiz from shooting at the Davis vehicle in the moment that it happened. Instead, Plaintiffs argue that the officers failed to intervene to stop implementation of the Nieves sting. They believe that the entire operation was poorly planned and executed, and that officers lacked probable cause to arrest Lara, Nieves, or Davis. Plaintiffs maintain that "[i]f the law enforcement Defendants lacked probable cause

to make the arrest, the[ir] failure to intervene was to stop the illegal plan hatched by Price from going forward." (Docket #117 at 19).

Defendants, for their part, insist that they had ample basis to find probable cause to stop the Davis vehicle for a number of different violations of criminal or traffic law. They further contend that they cannot bear liability for the allegedly haphazard plan when the only constitutional violation at issue is the shooting. Finally, Defendants assert the qualified immunity defense.

This claim must be dismissed for two reasons. First, by refusing to defend the underlying claim of unreasonable seizure from Defendants' arguments for dismissal, *see supra* Part 4.2, there is no longer an underlying constitutional violation for which Defendants could have failed to intervene. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]").

Second, Plaintiffs have also conceded the application of qualified immunity to each of the officers implicated in the failure-to-intervene claim. Despite Defendants' arguments in favor of qualified immunity on the failure-to-intervene claim, Plaintiffs' qualified immunity discussion is limited solely to Ortiz's bid for immunity from his use of deadly force. Plaintiffs' silence as to the failure-to-intervene claim acknowledges that qualified immunity is appropriate. *Bonte*, 624 F.3d at 466. The Court would likely apply qualified immunity in any event, as the Seventh Circuit recently detailed the uncertain status of the case law applicable to Plaintiffs' failure-to-intervene theory. *Williams*, 797 F.3d at 482–83 ("Our caselaw is far from clear as to the relevance of pre-seizure conduct, or even as to a determination as to what conduct falls within the designation 'pre-seizure,'

although the majority of cases hold that it may not form the basis for a Fourth Amendment claim.")

**4.4 *Monell* Liability – Walworth County, Town of East Troy, and Village of East Troy**

Local government entities, such as municipalities and counties, cannot be held vicariously liable for constitutional violations committed by their employees. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). These are colloquially referred to as "*Monell*" claims.

The *Monell* claims against the Town and Village are based solely on the failure-to-intervene claim, which stands dismissed. Without an underlying constitutional violation, a *Monell* claim cannot lie. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504–05 (7th Cir. 2010). The *Monell* claim against the County has two facets. The first relates to the lack of training regarding use of confidential informants, which bears on the failure-to-intervene claim. This aspect of the claim must, therefore, be dismissed without further inquiry.

The only *Monell* claim the Court can consider on its merits is that against the County for failing to properly train Ortiz on the use of deadly force. A failure-to-train claim is actionable only if the failure amounted to deliberate indifference to the rights of others. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference exists where the defendant (1)

failed "to provide adequate training in light of foreseeable consequences"; or (2) failed "to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029–30 (7th Cir. 2006). In essence, the defendant must have actual or constructive notice of a problem. *See Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997). The plaintiff must also prove that the training, or lack thereof, caused his constitutional injury. This is more than mere but-for causation; the plaintiff must demonstrate that the training policy was the "moving force" behind the injury. *Lapre v. City of Chi.*, 911 F.3d 424, 430 (7th Cir. 2018).

Plaintiffs variously describe the claim as alleging a lack of training on deadly force generally, and specifically on shooting at a moving vehicle. Neither theory has merit. As to the first theory, Plaintiffs suggest that the only deadly force training provided to deputies was gun range sessions. This is false. Ortiz underwent not only firearms training, but also annual training on use of deadly force, high-risk vehicle encounters, and judgment and decision-making. The County also enacted an express policy on use of deadly force which mirrored that employed by the State of Wisconsin. Plaintiffs have not demonstrated that the County's deadly force training was so obviously deficient that it evinced deliberate indifference on the County's part, or that a lack of additional or different deadly force training was the moving force behind Davis' death.[8]

---

[8]As noted above, it appears that Landers has some criticisms of the County's training program. (Docket #116-1 at 34). Plaintiffs inexplicably failed to mention this at all in their brief, however, much less make a cogent argument about it. (Docket #117 at 23–26). The Court will not construct appropriate arguments on litigants behalf. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1335 (7th Cir. 1995) ("The federal courts will not invent legal arguments for litigants.").

As to the second theory, Plaintiffs argue that the County was on notice that it needed more robust training on shooting at moving vehicles. Their only support for this notice is a single news article from 2012, which discusses an incident where a County sheriff's deputy shot a suspect who was driving at him. (Docket #116-2). A single constitutional violation can, in limited circumstances, trigger a municipality's duty to create or change its policies, if a subsequent violation is a "highly predictable consequence" of a failure to act. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (quotation omitted). But the statements in the article are hearsay, and cannot be used to prove that the incident actually occurred.[9] Summary judgment is the "put up or shut up" moment in a case. *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). Without any admissible evidence on the point, Plaintiffs' have "put up" absolutely nothing to support this *Monell* theory.

### 4.5 Indemnification – Walworth County, Town of East Troy, and Village of East Troy

Though Plaintiffs' brief states that this claim is "not at issue," they are incorrect. Defendants argued for dismissal of the claim because they were not given proper notice of it in accordance with Wisconsin law. Such notice is a condition precedent to the filing of a state law claim against a Wisconsin municipality or its employees. *See* Wis. Stat. § 893.80(1d). The point, as has become an unfortunate theme in this case, is conceded. *Bonte*, 624 F.3d at 466.

---

[9]In any event, the article does not even establish a constitutional violation on the deputy's part. It states that the deputy would not be charged by the state with wrongdoing in connection with the shooting. (Docket #116-2).

### 4.6 Wrongful Death – All Law Enforcement Defendants

This claim has been dismissed pursuant to the parties' stipulation. (Docket #126).

### 4.7 Wrongful Death – Lara and Nieves

Lara and Nieves are in default, (Docket #43 and #48), and no party has moved to dismiss this claim against them. The claim remains subject to a motion for default judgment.

## 5. CONCLUSION

In light of the foregoing, Defendants' motions for summary judgment will be granted in large measure. Counts Two through Eight will stand dismissed. Only Count One will proceed to trial. The Court will also grant a motion to restrict filed by the Village. (Docket #95).

Accordingly,

**IT IS ORDERED** that the motion for summary judgment of Defendants Juan Ortiz, Kurt Picknell, Walworth County, and Wisconsin Municipal Mutual Insurance Company (Docket #91) be and the same is hereby **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that the motions for summary judgment of Defendants Alan Boyes, Employers Mutual Casualty Company, Aaron Hackett, Jeff Price, Jeremy Swendrowski, and Village of East Troy (Docket #97), and Defendants American Alternative Insurance Corporation, Craig Knox, Paul Schmidt, James Surges, and Town of East Troy, (Docket #103), be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Counts Two through Eight of the Amended Complaint (Docket #71) be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Defendants Walworth County, Kurt Picknell, Town of East Troy, Village of East Troy, James Surges, Alan Boyes, Jeremy Swendrowski, Paul Schmidt, Craig Knox, Jeff Price, Aaron Hackett, Employers Mutual Casualty Company, and American Alternative Insurance Corporation be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that the motion to restrict by Defendants Alan Boyes, Employers Mutual Casualty Company, Aaron Hackett, Jeff Price, Jeremy Swendrowski, and Village of East Troy (Docket #95) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 25th day of November, 2019.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge